Grabb, J.
delivered the unanimous opinion of the Court. The defendant in error brought suit against the plaintiff in error, in trespass. The plaintiff in error pleaded that Phebe -was a slave and his property. Whether she was free or a slave was the question. The cause was tried before a circuit judge in Sumner County, and a verdict returned by the jury for Phebe. A judgment was entered, “ that the plaintiff recover against the defendant her freedom and .the damages, &c.” Vaughan prayed an appeal, in the nature of a writ of error, to this Court.
At the trial Vaughan, by his counsel, objected to the reading of the depositions of Seth It. Pool, and so much of those of Martha Jones and Phebe Tucker as related to hearsay or information from others. Phebe, by her counsel, offered as evidence a record of .proceedings in a court of the State of Virginia, in the suit of Tab and others against Littlebury Tucker, commenced in 1799, and ended in 1812, to show that Tab had a verdict and judgment for her freedom. Tab was proved to be. the maternal aunt of Phebe. Vaughan objected also to this record, but the Court below admitted the vvhole of the depositions and the record to be read, to which Vaughan excepted. The residue of the evidence in the cause is not set out in the bill of exceptions.
[Here the Judge recapitulated the evidence of Pool, and that part of Martha Jones and Phebe Tucker’s objected to ; but as this is all set out in the statement of the case, it is deemed unnecessary again to insert it here.]
Some of us have had much difficulty in coming to a conclusion satisfactory to our minds as to some of the points made in this cause. The peculiar value of the right claimed, and the improbability of such a right being successfully asserted in many instances, except by such evidence as that which has been resorted to on this occasion, on the one hand; and on the other the want of entire coincidence between [17] what has been heretofore done by judicial tribunals, whose decisions are precedents for this, and what we are now asked to do, added to the imposing character of two decisions, both of which, and one especially, would seem to militate against the introduction .of the evidence received in the Court below, have, been the causes *398 of that difficulty. To the arguments made, the decided cases produced, on both sides, and some others, a laborious and anxious examination has been given. It only remains for us to make known some of the considerations that have influenced us, and to announce the result to which we have been conducted, in the best exercise of judgment of which we are capable. ¥e shall not undertake to remark in detail upon either the books or the arguments relied on at the bar.
What the Circuit Court said, as to the effect of the evidence, or the purposes for which it was received, or what other testimony was brought forward to support the verdict, does not appear. The questions are, therefore, simply as to the admissibility of the depositions and the verdict and judgment for any legal purpose.
Let the first question be, Did the Court below err by admitting the depositions ?
That so much of them as relates to pedigree is legal evidence, was admitted by the counsel for Yauglian in argument. This is certainly a matter of long standing, such as those where courts, “ from necessity, and on account of the great difficulty of proving remote facts in the ordinary manner by living witnesses,” have been in the habit of receiving hearsay and reputation as to pedigree. And I suppose the proof has been made by the best procurable witnesses, taking into view the lapse of time, the removal of the plaintiff below into this from another and distant government, and other circumstances. Such proof is generally expected from members of the family whose genealogy is in question, or others, who, from their situation, would be likely to possess the requisite knowledge. A brief examination will manifest that much more of the offered evidence is covered by the established rule in relation to pedigree than the counsel for Vaughan seemed to [18] suppose. Take the question of pedigree to be simply a question from what ancestors an individual derived his birth, which is a much more.confined and limited sense than is often practically applied to it. Suppose that Phebe, instead of alleging, as she does in this case, that she is descended from, or, in the language of the witness, has her extraction from a long line of Indian ancestors, had assumed the position that she was descended from a maternal great-grandmother, named A. B., could she not prove this by hearsay or reputation, after having first established the freedom of A. B., or with the intention of afterwards establishing it ? No one will deny that she could. Why can she not, with equal propriety, show in the same manner that she is maternally descended from the Indians of America, after having first shown, or intending otherwise to demonstrate, that those Indians were either all free, or that they were at least prima faoie to be presumed free ? It may be here remarked that, if Phebe be shown to be descended from Indian ancestors in the maternal line, all doubt will cease as to her being at least prima facie free. Had *399 the residence of her ancestors always been in this State, we apprehend the fact of such descent would be conclusive evidence of her freedom. But her ancestors came, or were brought into Virginia, and the plaintiff below lived in that government until she was, some years since, brought here. The Court of Appeals of that State, who must be presumed to have construed their own statutes aright, say (Hudgins v. Wright, 1 Hen. & Mun. 139) that the act of Assembly of Virginia of 1691 repealed the Acts of 1679 and 1682. And we heartily concur with them in the opinion that, although an Indian, taken into Virginia between 1679 and 1691, might be a slave, yet “ all American Indians and their descendants are prima facie free, and that where the fact of their nativity and descent in a maternal line is satisfactorily established, the burden of proof thereafter lies upon the party claiming to hold them as slaves.”
Let us return to the doctrine of hearsay evidence, in cases of pedigree : —
Hearsay or reputation, under the rule with regard to pedigree, [19] is not confined to the fact of descent from a specified ancestor, or a tribe or nation of ancestors. It may be received to show the truth of another fact from which such descent can be reasonably inferred. “ Thus,” says a popular writer on evidence (Phillips’s Ev. 168), “ declarations of deceased members of the family are admissible evidence to prove relationship ; as who was a person’s grandfather, or whom he married, or how many children he had, or as to the time of a marriage, or of the birth of a child, and the like, of which it cannot be reasonably presumed that better evidence is to be procured.” (See Bul. N. P. 294, 3 Starkie’s Evidence, 1113, and the reported cases cited at the bar.) From this examination, it appears to us clear that the Circuit Court did not err in admitting those parts of the depositions which speak of any of the persons whose genealogy is in question, having been called of Indian extraction, “ called of Indian descent,” &c., which is tantamount to saying they were commonly reputed to be descended from the Indians, &c. &c. So also that the Court did not err in receiving the hearsay as to Murene being reputed an Indian, &e.
But these depositions contain statements of the common reputation, in the State of Virginia, that some of the persons whose freedom was in question were free. And hence arises the most difficult and embarrassing question, whether, when it becomes necessary to inquire into occurrences of a remote period, common reputation is admissible to prove the right to freedom ?
From the nature of the remedy provided, and for a long time sanctioned for the enforcement of the right of freedom, there must necessarily often be inquiries into the transactions of remote periods. This remedy, as is well known, is the action of trespass. Whenever necessary to bring suit, there has, of course, been a continuation of the trespass up to the time, or *400 near the time of commencing it. The Act of Limitations would, consequently, be no bar. Hence, results the necessity of often introducing proof of a kind that would be unusual and unnecessary in ordinary cases. And partly from this cause, this case is assimilated to cases [20] which have been allowed an exemption from the strict rule prohibiting all sorts of hearsay evidence. It may be added, without our intending to give an opinion either way, as to the correctness of the position, that very respectable judges have maintained the broad position, without allusion to the form of action, that length of time does not bar the right of freedom in the same' way and to the same extent as in other cases. (See Judge Roane’s opinion in Hudgins v. Wright, ubi supra.)
How is an individual in this country, who is unfortunate enough to have a woolly head and a colored skin, to prove that he is free? Not being white nor copper-colored, nor having straight hair and a prominent nose, the presumption probably is, that he is a slave. (See Hudgins v. Wright, ubi supra.) Contrary to the general rule, he who is charged with having trespassed upon his person, pleads an affirmative plea, and yet need not prove it. He says, in justification of his trespass, that the plaintiff is a slave, and yet on that plaintiff is devolved the onus probandi to show himself a free man. How is he to show it ? He may, perhaps, procure testimony that he or some ancestor was for some time in the enjoyment of freedom ; that he has acted as a freeman ; that he has been received as a freeman in society; and very soon will find himself under the necessity, increasing in proportion to the distance he has to travel into time past for want of other evidence, to use hearsay, that he or his ancestor was commonly called a freeman, or commonly reputed a freeman, or, in other words, evidence of common reputation. And why should he not? Is it a concern of so little moment, that the law, in its benignity, ought to refuse it those aids for its support and protection that have been so. exuberantly extended in analogous cases ? Is it of less importance than the right of digging stone upon the waste of the lord of a manor? (Moorwood v. Wood, 14 East, 327.) Or the right of the lord to take coals from under the lands of those holding under him ? (Barnes v. Mawson, 1 Maul, and Sel. 77.) Or a right to have a sheep-walk over a piece of land ? (3 Starkie’s Ev. 1209.) Or a right of way over a piece of land? (Bul. N. P. 295.) Or to a modus by which [21] sixpence an acre should be paid in lieu of small tithes ? (Harwood v. Sims, Wight’s Ex. Rep. 112.) These are a few out of many cases.
But it is said these rights, franchises, &c. which in England are permitted to be established by common reputation, or hearsay of common reputation, are, or savor, of a public character; and therefore the public, where this reputation is to be formed, will be more apt to possess a knowledge of their existence, &c. We put it to the candid and the enlightened whether the *401 right to freedom has not in this respect very much the advantage over many of those rights where such evidence is every day received in the English courts. Indeed, it is no light matter to be a freeman in these United States. Freedom in this country is not a mere name, — a cheat with which the few gull the many. It is something substantial. It embraces within its comprehensive grasp all the useful rights of man ; and it makes itself manifest by many privileges, immunities, external public acts. It is not confined in its operations to privacy, or to the domestic circle. It walks abroad in its operations, — transfers its possessor, even if he be black, or mulatto, or copper-colored, from the kitchen and the cotton-field to the court-house and the election ground; makes him talk of Magna Charta and the Constitution ; in some States renders him a politician, brings him acquainted with the leading citizens, busies him in the political canvass for office, takes him to the ballot-box ; and, above all, secures to him the enviable and inestimable privilege of trial by jury. Can it be said that there is nothing of a public nature in a right-that thus, from its necessary operation, places a man in many respects on an equality with the richest and the greatest and the best in the land, and brings him into contact with the whole community ? Can it be said that common reputation is no evidence of a right, producing so many effects relative in their character, to that very society where the common understanding, report, or reputation is required to exist ? Can it be said that the community or neighborhood, as the case may be, the “ public” around a man, will too readily give credence to a claim by which, the individual [22] who makes it obtains among themselves so high a comparative elevation ? If those around him have interest or prejudice they will usually be against his claim. I't is difficult to suppose a case where common reputation would concede to a man the right to freedom if his right were a groundless one. If such a case be imagined, it will most probably be au extreme one; and we must bear in mind that, when the evidence we are speaking of is received, it is not regarded as conclusive. It is to be weighed, encountered, and compared with other evidence; and ultimately to have no more effect than, after full examination, the jury shall be disposed to give it. I cannot see how dangerous consequences are likely to result from its admission.
Slavery, in our sense of the word, is not known in England. Such a right of franchise, therefore, as an exemption from slavery existing around them has no place there, and rules with regard to it are unknown to their code. The right to freedom in this relation, as well as the mode of proceeding for its assertion, is of American growth. Courts cannot be expected to shut their eyes on this important circumstance.
Let not gentlemen object that prescriptive rights are regarded as null in England, or, at furthest, not more than ■'prima facie good, unless they have had existence, time whereof the memory of man is not to the contrary, and *402 unless the claimant can bring himself within the strict rule as to recent enjoyment; and that, therefore, we ought not to liken the right of freedom to them, as we cannot preserve the parallel throughout. We must ask them to recollect that we are not relying on cases as to prescription, &c. as precedents in this cause, but that we are endeavoring by analogy to ascertain what is the rule in a new casé, in a new sort of action, as to a new sort of right. •Nullum simile est idem, or, in the language of the Supreme Court of the United States, in the case of Nichols and Webb, we are endeavoring to “ adapt the rule of evidence to the actual condition of men,” believing that in this sense it must “ expand according to the exigencies of society.”
Common reputation may be proved in cases of custom, [23] prescription, &c. It must be reputation as to the right, privilege, franchise, &c. claimed, and not hearsay evidence as to any particular fact from which the right, &c. might be inferred; contrary to what is certainly the rule in cases of pedigree and boundary. They stand in this respect upon different grounds (Peake’s Ev. 13), as in cases of the former kind it has been said, so I would say in the instance before us, you may prove the right to freedom by common reputation as to the existence of the general right. But you may not introduce any evidence of hearsay or reputation as to any particular 'fact. The right to freedom js believed not to be a particular fact in the sense in which the latter expression is used in the books. It consists in the exercise and enjoyment of multifarious exemptions, privileges, and rights. In its exercise and enjoyment it produces many particular facts.
So far as the cases produced- in Cranch and Wheaton vary from the above principle, if they do so, they have not the approbation of our judgments, and we must dissent from them. •
The cases cited from Washington and Henning & Munford’s Reports, go strongly to support the view we have taken of the subject, and we concur with the reasoning of the Court in those cases.
While, however, we place much reliance on the cases decided in Virginia, we are by no means prepared to subscribe to the correctness of the doctrine urged with earnestness on the part of the defendant in error ; that the decisions of the courts of Virginia, as they are binding, and demonstrate what the law is there, must he binding here also, this right to freedom having had its origin in that State, and the plaintiff below having had her domicil residence there until lately. Counsel say she would be declared free there, and therefore should be free here.
. It is apprehended that this would be carrying the doctrine of comity between the judicial tribunals of independent states and empires farther than it has ever yet been extended under the influence of the rules of international law or the peculiar provisions of our federal Constitution. [24] True it is that the decisions of the Virginia courts, as to the proper construction of their own statutes, would be unquestioned by any tribunal in any other *403 government. In Elmendorf v. Taylor, 10 Wheat. 159; 6 Wheat. 119; 5 Cranch, 234; 4 Cranch, 428.
And so it would be as to their decisions with regard to real property situated there ; the universal rule being that courts are to be governed, as to that sort of property, by the lex loci rei sitce. Vattel’s L. of N. and N. b. 2, ch. 8, §§ 103, 110; 10 Wheat. 192,468; 7 Cranch, 115.
It is equally true, and very notorious, too, that contracts are generally to be understood and given effect to agreeably to the law of the country where made.
But is it conceived that the question here is not within the governance of any one of the foregoing principles ? To say that Phebe was free in Virginia is begging the question. They certainly have no statute which pronounces her free. -Whether free or not would depend upon the finding of a jury as to the fact of freedom. The difficulty is as to what evidence shall be received to show that she is free, as to what is the true mode of ascertaining facts of a certain character. And that is to be determined by the rules of common law, modified and applied to the actual condition of men and things in this country. On such a subject courts in Virginia judge for themselves. And courts here are bound to exercise and pronounce their own judgments.
There is another point of view in which to place this subject. No doubt the most of the proof in controversy is admissible to show pedigree. Is not the whole of it ? When you offer evidence of reputation as to whether a person at a remote period was free, are you not endeavoring to show that he was descended from free ancestors ? Are you not showing his descent? Are you not proving pedigree ? At all events, the necessity for the evidence being equal, is not the principle the same, requiring its introduction in both instances?
So far, then, as the depositions have allusion to pedigree- or common reputation as to freedom, we believe them to [25] be competent evidence. But they contain some statements which are not considered admissible ; and in receiving which we think the Court erred. We allude to the evidence of several of the family having recovered their freedom by due course of law, &c. This ought to have been rejected. It would have been better proved by the records themselves. And it is a maxim of the law of evidence, as true as it is trite, that the best evidence which the nature of the case admits shall be produced. What is said respecting Tab’s case was properly admitted, because the record in her case was produced.
But there is a remaining question. Did the Court err by receiving the verdict and judgment in the suit of Tab and Others v. Tucker? That was a suit by Tab for her freedom. She obtained a judgment in her favor on the ground that she was descended from Indian ancestors, as appears from the record. Tab was the maternal sister of Beck, who was the *404 mother of Phebe. We think that hearsay evidence that the maternal sister of one of Phebe’s ancestors was always reputed to have been descended from Indian ancestors, or that she was reputed to be free, as having been descended from Indian ancestors, would be some evidence in a case of pedigree to show that Phebe also was descended from the same. And therefore we consider the solemn verdict of a jury upon proofs produced to them many years ago, and with the judgment of the Court upon it, full as good evidence, to say the least of it, of what was considered the truth in those days.
We do not consider the question as to the introduction for any purpose of verdicts between others than parties and privies as involved in the determination of this case in any manner whatever. Nor is any opinion given as to the admissibility of judgments, except in the single case of a verdict and judgment offered as hearsay evidence in a case of pedigree, as in the case before us. Such a verdict and judgment was held to be admissible by the Court of Appeals in Virginia, in Pegram v. Isabel, 2 Hen. & Mun. 193, and, we believe, properly.
Upon the whole, we are all of opinion that the following [26] judgment and directions be entered in this cause: reverse the judgment, and remand it to the Circuit Court for a new trial, and to reject the following words in Pool’s deposition : “ And that Abner, the brother of Phebe, the plaintiff, sued, as he is informed and believes, said Thomas Hardeway, and was killed by him ”; and to reject the following words in Martha Jones’s deposition : “ Deponent believes all Phebe’s relations in those parts have also obtained theirs, on the plea of their being descended from an Indian ancestor. Has also understood that one of the same family, named Minor, and several others have since got free, as will appear of record ”; and to reject the following words in Phebe Tucker’s deposition: “ Deponent believes all Phebe’s relations in those parts got their freedom on the plea of their being descended from an Indian ancestor; always understood that Molly Moore had one of the family by the name of Minor, and several others, all of whom have obtained their freedom upon the'same plea” ; and to admit the residue of said depositions, and also the verdict and judgment, with the proceedings upon which they were founded, in evidence to the jury.
Judgment reversed.